1660646 Gross v. NCH Corporation Mr. Swann, go ahead. Your Honor, may it please the Court, my name is Dana Swann, and I am one of the attorneys who represents the appellants in this case. This is a case involving an outbreak of Legionella disease which occurred at the Hotel Chester, which is a small boutique hotel located in Starkville, Mississippi. There were two parties that were injured. One party is the Grosses. They are from Wisconsin. Ms. Gross died, her husband, I'm sorry, Ms. Gross suffered bad injuries from Legionella. Her husband died. The other three appellants are the Hortons, where two of them were diagnosed with Legionella. Bobby Horton was never diagnosed with Legionella, but our treating physicians were going to testify that his symptoms were consistent with that. That lays down the basic premise of the case. We have two parties, five individuals who contracted Legionella. The appellee has stipulated four of the five got Legionella. So the fact that they got Legionella is not an issue. We did not sue the Hotel Chester. Normally in these cases you would sue the hotel because, well, obviously they're the obvious defendant. The Hotel Chester is a small, family-owned hotel with no insurance. Their insurance policy excluded this type of injury. They were also bankrupt. So if we sued them, we would be languishing in bankruptcy court and probably wind up with a useless verdict.  Well, we settled with NCH, I'm sorry, we settled with Boston, the manufacturer of the cooling tower. We settled with them and we settled with Kim Aqua. Kim Aqua is a division of NCH, but they came in after the outbreak. We did not know that initially. So we basically dismissed them. The target of this case is NCH and their subsidiary Certified Labs. The case against them, based upon our theory, and again, this is our theory, our theory was NCH, through its employer, Ed Smith, failed to provide the proper chemicals to minimize the outbreak of Legionella in the cooling tower. Now, that's our theory. Our theory was, had the proper chemicals been utilized initially, and again, we're talking about like an eight-year period. That's when Ed Smith provided chemicals for the Hotel Chester. Had the proper chemicals been utilized, the initial outbreak would not have occurred. You say that should be used as a matter of routine? Sir? That should be, those chemicals should have been used as a matter of routine? Yes, yes, and I'll get to that. When you treat a cooling tower, there's two different types of chemicals you use. You use an oxidizing biocide, which is basically chlorine, and that essentially kills the bacteria. Now, there is another biocide called a non-oxidizing biocide that doesn't work the same way. It really interferes with the DNA of the bacteria, so it's not as effective. Now, we had two experts who said that the proper technique, the proper protocol to follow would be to use an oxidizing biocide. Well, Judge, Jordan's opinion quotes one of those experts at an earlier time as saying there's no standard for this in the industry. I'll get to that, Judge. Here's the problem. Here's the problem. These people who treat water, the experts in this area, such as Dr. McCoy, Lyndon Witherell, engineers that belong to ASHRAE, engineers that belong to the Cooling Tower Institute, they are engineers, they're scientists, they're laypeople. They don't use the same terms that we use. Lawyers use the term standard of care or duty. You talk about standard of care and duty to them, their eyes glaze over. They don't really know what you're talking about. Now, if you look at the record, though, in fact, if you look at the Cooling Tower Institute, the Cooling Tower Institute is entitled Best Practices. Okay, the trial judge saw the term Best Practices, and there's a non-reported decision from the Fifth Circuit that says Best Practices are not standard of care. That decision, first of all, is not reported, so it's not precedent. If you look at that decision, the Best Practice part came in on a motion to reconsider, and they never looked at it. So there's a case that says Best Practices are not the same thing as a standard of care. But when you look at what these experts, the men and women in the field, whose job it is to prevent Legionella, when you look at what they call Best Practices, it's the same thing that we call duty of care or standard of care. They're talking about the same thing. If you look at, for example, if you look at the CTI Institute, which says Best Practices, if you look at that, and I'll give you the exact sites in the record as to where you can find it, it's called Cooling Technical Institute Legionella Guidelines, Best Practices for Control of Legionella. And it's found at 2512 through 2522 in the record. And it was part of one of 34 exhibits that we attached to our motion in opposition to summary judgment. If you look at, for example, the purpose, I'm not going to read a whole lot of this. It says the purpose of this guideline is to provide information and guidance in order to minimize Legionella and evaporative cooling water systems. Now, Judge, isn't that what we want? Isn't that a standard of care? Well, that's one statement. But if Legionella is like, let's say, typhoid fever, which is now basically eradicated, I mean, that would be eradicated by the chlorine, I suppose, or the mosquitoes. But, you know, the fact that they address Legionella doesn't mean that that is necessarily something that every hotel, every conscientious hotel in the United States would treat for. Because as I understand it, it doesn't, you know, as long as you have a proper cooling system, it's not going to be a routine problem. No, Judge. In order to prevent Legionella from being spread by these cooling towers, you have to have a proper water treatment program. Without that. But are you saying that every conscientious hotel in the United States is going to treat for Legionella because that's what a standard of care means? No. Every hotel is going to treat for, to keep the tower clean and to minimize the growth of bacteria. When you do that, an outcome of that is you control and minimize the outbreak of Legionella. Legionella is one of a number of different bacteria found in the cooling tower. There's probably Legionella in the cooling tower here. There's probably Legionella in the water here. But the thing is, it doesn't reach a level where it injures people because you don't have it splashing in the air and you don't inhale it. And it's probably controlled by an oxidizing biocide. So the judge got confused by the term best practices. If you look at this cooling tower, if you look at this document, it goes, it says the purpose of this is to minimize Legionella. Now, we can't argue that that's not a, that should be the standard of care. The standard of care should be to do something to minimize Legionella. Did your experts say that, say that to exercise reasonable care, you should use one of these chemicals? Yes. What they said was you have, it is the industry best practice to do this. And if you do this, you minimize the risk of Legionella. Now. You guys said chlorine is the standard, right?  That's the oxidizing biocide. That's the oxidizing biocide. All right. And you're saying that in addition, they had to use the non-oxidizer. No, no, no, no. No. Here's what you do. They did use the chlorine. We know that, right? Here's what, here's what you do. And this, again. They did use the chlorine, did they not, sir? No. Here's what you do. This is, and this is set forth, it's really set forth in McCoy's opinion. It's a 13-page opinion where he outlines exactly what you do, and it's got 20 footnotes explaining why you do this. Now, how is, how this is a conclusionary affidavit, I have no idea. Here's what you do. You, first of all, you prescribe an oxidizing biocide. That's, that is the industry best practice. You prescribe an oxidizing biocide. Then you monitor the water level, not for Legionella. You, you don't test for Legionella. That's, that's another red herring. You don't test for Legionella. You monitor for the bacteria count. Because Legionella is just one of a bunch of different bacterias. So you monitor the, you monitor the bacteria count. If it gets too high, that means one of two things. You're not using enough oxidizing biocide, in which case you need to increase the oxidizing biocide. If that doesn't work, then you come in with the non-oxidizing biocide. Well, didn't everybody agree finally that, that the Legionella bacteria was in the dead legs? Oh, sure, sure. Is that right? But dead legs are everywhere. You've got dead legs in this, you know, you've got dead legs in this office here. Dead legs is simply an area where water doesn't flow. You've probably got asbestos in this office here. That's a different, yeah. I mean, did, did any experts say that you needed to treat the, the water in the dead legs? Yeah, well, what, what, what the guidelines say you do is you inspect for dead legs. That's in, that's in the, in the CTI report. You inspect for dead legs. And you try to find them. And Ed Smith never looked for a dead leg. But when, when Kim Aqua came in after the outbreak, their guy found dead legs. Now, they never found the exact dead leg that was the problem. But they found other dead legs. What we've got here is a situation where, again, this is our theory of the case. And they have a totally different theory. Our theory is if Ed Smith would have ordered an oxidizing biocide and followed the procedures, the best practice procedures, which basically is the standard of care. Again, if a lawyer drew up, if a lawyer drew up guidelines, best practices for Legionella, he would have said standard of care for control of Legionella. But he didn't. There was no lawyer that drafted this. But again, we're talking about the same thing. So, had that, had the oxidizing biocide, the proper procedure been utilized, the outbreak would never have occurred. So, we go up to the point where the outbreak occurred. We have two experts that say if the proper procedure was utilized, we never would have gotten to this point. Now, what happened afterwards. Did Judge Jordan recognize your two experts and allow their testimony? He said, and this is baffling. He said their reports were conclusory. Well, my gosh, it's a 13-page report from McCoy. And he's got 20 footnotes explaining all of this. He goes into great detail in what he's supposed to do. If that's conclusory, I don't know what Dobbert is about. He just basically said our experts were conclusory. He didn't believe McCoy, who's got a PhD in microbiology, who drafted what's called the ASHRAE Standard 188, who was on the committee to do that. And then we've got Lyndon Wetherall, who's the expert that the Mississippi Department of Health sent after the outbreak. We've got these two experts that say the same thing. If you would have followed the proper water treatment technique, you would have never have gotten to this stage. And that's our theory of the case. What happened afterwards, we say, you know, hey, it doesn't really matter what happened afterwards. What matters is prevent the initial outbreak. And the judge totally missed the point. In fact, he said in there somewhere there was no evidence that NCH sent Ed Smith to do anything. And I'm thinking, what? What about Respondent Superior? To NCH's credit, in their brief, they did recognize that that statement really didn't follow Mississippi law. And they did say, well, under Respondent Superior, they would be liable for Ed Smith if he did something wrong. But he didn't do anything wrong. But Ed Smith never, ever recommended an oxidizing biocide or a non-oxidizing biocide or proper treatment. He didn't know the difference. He said, well, you can use one or the other. It doesn't make any difference. Use one. If it doesn't work, use the other. He didn't know anything. He basically was not the proper person to do this. Our theory was NCH should have sent Kim Aqua because they're the experts in treating Legionella. I think my red light is up. Does that mean I'm finished? Thank you. You have time for rebuttal. Thank you. All right. Ms. Champagne. May it please the Court, Amy Champagne for NCH Corporation. The theories, the plaintiff's theories in this case and the arguments have been a constantly moving target. But before I delve in to talk about the Court's reasoning in excluding the expert opinions and granting summary judgment in this case, I do think that there is a need to look at the record evidence and to discuss particular what Ed Smith's role was in the water treatment at the hotel. Because the plaintiff's allegations and their expert's criticism presuppose that Mr. Smith had a much bigger role and more control than he actually did. What the record shows is that Ed Smith was a commissioned salesman. He visited the Hotel Chester in Starkville approximately once a month for 30 minutes. And while there, he recommended chemicals that were intended to maintain the integrity of the metal cooling system and to increase its efficiency. And what that means and what the literature recognizes is that most water treatment systems or regimes are meant to reduce scale, corrosion and biofilm. And the biofilm impedes heat transfer. So this is really just an industrial air conditioning system is what we're talking about. But there's nothing in the record to show that Mr. Smith actually treated the cooling tower or undertook any service. Did they just use town water, I suppose, circulating through the tower, right? That's correct, Your Honor. Do hotels like this normally add extra chlorine to the water that they circulate through the cooling tower? Your question raises a point that I wanted to get to. So Legionella doesn't act like other bacteria that we're all familiar with. And in fact, even if chlorine were required, and I'll discuss why the literature doesn't support that, this bacteria can survive chlorine treatment. And in fact, it does survive most municipal chlorine treatments. So it's already been treated by the city. But yes, additional chemicals are routinely used in cooling towers, but not for the purpose of killing Legionella. And the reason for that is that Legionella's ubiquitous, Your Honor. It's in all, it thrives in all aquatic environments. And it cannot be eliminated. It's just there. It's undisputed on the record and in the literature that there is no correlation between the level of Legionella and the risk of disease. And that's really important here in this case, where, this case of first impression, where the plaintiffs are asking the court to impose a duty. Well, you're going beyond that. The question is whether the hotel had some duty to do preemptive treatment for Legionella, right? Or NCH had the duty to advise it, right? Yes, that is the question. Okay. And what did Judge Jordan say? Judge Jordan said there was no duty. That, not that there was no duty, that the plaintiffs failed to come forward with any competent summary judgment evidence to support the imposition of a duty in this case. So what they relied on, there's no statute, no regulation. There's no judicial opinion. And Judge Jordan correctly observed that NCH didn't voluntarily undertake a duty to treat Legionella. So that leaves the plaintiffs with their experts opinions. And those opinions were nothing other than Ipsy Dixit. They can't point and didn't point Judge Jordan or this court to anything in the literature that says that you have to use an oxidizing biocide or chlorine. And in fact, the literature, CTI and AWT and all of these other organizations that address water treatment and cooling systems recognize that there are a multitude of treatments for Legionella, some of which aren't even chemical. Some of them are ozone treatments and light treatments. There are a variety of treatments. But McCoy can't point anywhere that says that you have to use or you must use chlorine. And in fact, you have to be cognizant of the system. We're talking about metal. If chlorine can't kill, can't guarantee it's gonna kill the Legionella, you could flood the system with chlorine, which is what they actually did after they found the Legionella. The system, Molander testified that he was finding metallic debris in the trays at the bottom of the system when they were treating it. And they still couldn't kill the Legionella because of the deadlift. You're saying the chlorine caused that metal to flake off? Yes, Your Honor. It would corrode the system. So there is a weighing here. And Ed Smith's job was only to recommend chemicals for treating the system that had to maintain the integrity of the system and the efficiency. And I wanted to go back to the factual point about Mr. Smith. As a salesman, all he could do was recommend chemicals. He couldn't make the hotel purchase them. And in the record, Mr. Smith testified that when he first went to the hotel, he recommended an oxidizing and a non-oxidizing biocide. Mr. Molander, the only other party to that conversation, doesn't directly contradict that. So that is in the record. If there was some duty to offer these or to warn, that's there, although I would submit that the hotel guests don't have a cause of action against NCH for that. Did the treatment that went into the system, did it reach the dead legs? No, Your Honor. So tell me, the dead legs are piping that somehow are isolated from the system? That's correct. It's water that is completely isolated from the circulating portion of the system such that it's stagnant. And in this cooling system, we're talking about warm water, which is the perfect environment for bacteria and Legionella to grow. And because it was cut off, no amount of chemical treatment in this system was going to prevent the Legionella. Legionella amplifies very quickly. You might be able to get a non-detectable level of Legionella today, and tomorrow your system could be completely infected again. It grows very rapidly. And so what was happening in this system, as is shown by the facts in the case, and frankly, plaintiff's counsels made the best argument in their brief about why the dead legs are the proximate cause. Once the system was treated, that stagnant water containing Legionella was released. It had not been treated. So the system was continuously reinfecting itself every time the pumps were alternated. So that is the proximate cause in this case. And I believe that all the parties agree to that. And rather than directly address that, the plaintiffs just want you to ignore it by excluding the evidence. There is a variety of questions here all related to standard of care, duty at all, standard of care, if there is. Judge Jordan found no source for duty in this case. He questioned, found unconvincing, found non-expert. In conclusory, the effort by the defendants, the plaintiff's experts to say what such a standard might be. What do you say is the appropriate thing from your viewpoint for this court to say? That there is no standard? That there's no evidence, at least in this record, of what that standard would be? I mean, basically, what you have are the hotels and other businesses using city water, which could well have, which will have Legionella in it, could well lead to situations like this. Is this a case that should stand for the proposition that these hotels and others have no duty, or just that it has not been identified yet for purposes of this case? Well, Your Honor, hotels have a non-delegable duty to protect their guests from unreasonable risk of injury. The hotel was in a different position than NCH. NCH is only selling chemicals. The hotel is determining what chemicals they want to use. They're the ones that are actually using the chemicals in the system. Mr. Smith didn't, never put chemicals in the system at the hotel. That wasn't his job. They also are responsible for maintenance. But a hotel has other, could undertake other actions. For instance, they could reduce the opportunity for exposure. A lot of this literature talks about the placement of cooling towers. It starts at the very beginning in the design process, but this particular cooling tower was situated on the roof of this hotel in downtown Starkville, such that in the summertime when the drift, which is the water vapor that comes out the top, was raining down on the precise area where the hotel entertained guests, and where smokers sat. So there are, I'm not asking you to say that there's no standard of care for a hotel owner. I will submit that there's no standard of care for the chemical control of Legionella. Nothing in the literature says that that can be done. And even if you could limit Legionella, let's say we could control Legionella, that there is no evidence, scientific evidence, that that would reduce the risk of disease. Because there are other factors at play here. Not all Legionella is infectious. And it is a lot dependent on the host, the individual that's exposed. So the literature, and we've cited in our briefs, demonstrate circumstances where high levels of Legionella have resulted in no infections, and extremely low levels of Legionella have caused disease. So there's no correlation here. The control of Legionella in the water is not possible. And even if it were possible, you can't show that it would reduce the risk. Well, you could argue by the same token that if somebody did come down with typhoid at the hotel, that the hotel had a duty to spray for Anopheles mosquitoes. Right? Or not the hotel, the chemical company had a duty to sell chemicals to control mosquitoes to the hotel so that nobody would come down with Zika or West Nile or mosquito-borne diseases. Other words, you're holding the wrong person to a standard of care. Correct, Your Honor. I thought you'd agree. Well, it certainly would be desirable to reduce the level of the bacteria, wouldn't it? I mean, a hotel certainly does not want the level to rise. They want it to be as low as feasible. Well, certainly, Your Honor. I mean, of course, that would be the goal always would be to reduce the bacteria. But in this situation, the Legionella bacteria that we're talking about doesn't affect the efficiency or the longevity of the cooling tower. And the level of the disease isn't, again, there's no correlation to the risk of injury. The ideal would be if we were in a position scientifically to be able to completely eliminate Legionella, then certainly we could say if there's no Legionella, there's not going to be any Legionellosis. But all of the ASHRAE, AWT, CTI, the World Health Organization, they all recognize that there's no scientifically defensible safe level or danger level of Legionella. And that it's unreasonable, CTI states it's unreasonable to expect that a hotel will maintain the Legionella count at a certain level because it's just not possible. A lot of the, the literature emphasizes the need to consider all of the specifics of every cooling system individually and not to rely just on laboratory testing. Because as we saw in this case, this dead leg in this hotel, we could have dumped all the chlorine in the world in this cooling tower until we burned it up and not killed the Legionella under this factual circumstance. Okay. All right, thank you. Mr. Swan. Judge, first of all, let me address one thing that Amy said, and I probably would actually agree with it in where she said it's a moving target. This is one of those cases where you think you have the main defendant and you start conducting discovery, you get experts, the case goes on and suddenly you realize, my God, this isn't the main defendant, this is the main defendant. That's what happened in this case. I'll be the first to admit, we concentrated on the cooling tower because the CDC said that's where the Legionella was, it was on the cooling tower. But then when we got into discovery, we got into experts and then suddenly we realized, well, the problem with that is the cooling tower would not have had this Legionella in it had the proper water treatment protocol been followed. And Judge Southley, I think you hit the nail on the head with a hammer when you started talking about, is this a duty that we just haven't found yet? The hotel, they're trying to blame the hotel. Okay, and Judge Jones, with all due respect, I think there's a big difference between mosquitoes out in the environment and Legionella coming in from your cooling tower. Now we've got this hotel, it's got a cooling tower and they're saying, okay, the water treatment, we're NCH, we don't have any duty, Ed Smith had no duty, he wasn't there to control Legionella. Mr. Molendor, he's the guy that owns the hotel, it's your problem. What's Mr. Molendor gonna do? We've got two experts that say, yes, ultimately it is the premises owner who's responsible, but he can discharge that duty by relying on an adequate, proper water treatment company. Well, let me just cut to the chase here. What are you saying that NCH should have supplied to them? More chlorine. Yes. Not this non-oxidizing. Exactly. More chlorine. I mean, if chlorine causes little flakes of metal to come off of the, yes, how do you? That occurred because there was so much Legionella in the system because the water treatment procedure didn't follow the proper procedure. It built up so much that the system was overwhelmed. It was absolutely overwhelmed. Kim Aqua, who is the expert, came in, they dumped so much chlorine in there, they had to, to try to get rid of it, that it caused the pipe to corrode. Okay, now what's your argument about the dead leg? The dead leg, well, our argument about the dead leg is simple, dead legs occur everywhere. Everywhere. You'll find dead legs everywhere. But when they removed this, when they removed one dead leg and the problem still existed, they removed or wired around the second dead leg and the problem was cured. So that's pretty, how is that hard to argue with? Oh, very simple. Had the proper procedure been followed in the first place, the buildup in the dead leg would never have occurred. That dead leg was there all along. And there was, you know, they never had an outbreak for like 18 years. Do you have any evidence about that? Right. Do you have any evidence about that? What, that it was there all along? That there would have been no buildup in the dead leg had the quote proper procedure been followed? Yes, our two experts said that. Okay. Dr. McCoy said that, Lyndon Wetherill said that. He said that had the proper procedure been followed, the outbreak would never have occurred. But it would involve more than just putting chemicals in the system. You'd have to find these isolated dead legs and treat them. Is that right or not? Not really. I mean, ideally you should eliminate dead legs. In fact, that's in the CTI. But if you follow the proper procedure, you'll never have a problem with the dead leg. That's what our experts say. We have two experts that say that. Now, their experts say just the opposite, which is to be expected. You've got a bad leg. What do you do to avoid the dead legs? What, to avoid the dead leg? There's two pipes, there's two pumps that circle. You mean you gotta re-plumb it, huh? Right. They put a simple pipe between the two, which allowed the water to flow. I mean, it was a fairly simple design by- Who said that the chemical company should do that? Our expert. But what's, I mean, why would a chemical company have to re-plumb the piping system? Here's where we go back to our experts, and this is Judge Southwood's question. So, who best is in a position to treat the water? The water treatment company is in the best position. We have our experts that say they had a duty. Lyndon Witherall said they had a duty. Dr. McCoy said they had a duty. They claim they have no duty. Well, we've got a conflict there, Judge. Okay, well, thank you, sir. Your red light is on. Thank you, it's been a very interesting argument. It has been, indeed. I'm 72 years old, and it keeps me alert to arguments. You're definitely alert. Thanks a lot. We'll take a 10-minute recess.